UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

Wayne Dupee,                    :
        Plaintiff,             :
                               :
v.                             :      Case No. 3:05cv344 (JBA)
                               :
Klaff's, Inc.,                 :
        Defendant.            :

**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DOC. # 28]
AND PLAINTIFF'S MOTION TO STRIKE [DOC. # 38]**

Plaintiff Wayne Dupee commenced this action against his former employer, Klaff's, Inc. ("Klaff's") seeking redress for alleged retaliatory discharge in violation of Conn. Gen. Stat. § 31-290a (Count 1), alleged violation of the Federal Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq. (Count 2), alleged violation of the Connecticut Family and Medical Leave Act, Conn. Gen. Stat. § 31-55pp et seq. (Count 3), alleged failure to compensate plaintiff for time lost due to a workers compensation claim in violation of Conn. Gen. Stat. § 31-312 (Count 5), and alleged negligent infliction of emotional distress (Count 6), all arising out of his treatment and eventual termination from his position as a security officer at Klaff's. See Am. Compl. [Doc. # 32]. Plaintiff's Connecticut Family and Medical Leave Act claim (Count 3) was dismissed on consent based on failure to exhaust administrative remedies. See Order [Doc. # 20]. Additionally, in his opposition memorandum, plaintiff consents to dismissal of Count 5. See Pl. Opp. [Doc. # 35] at

1

26.[1]

Defendant now moves for summary judgment [Doc. # 28] on all remaining claims.  As to Count 1, defendant argues that plaintiff cannot prove that he was terminated for filing a workers' compensation claim and, even if he could establish a prima facie case of retaliation, Klaff's has presented a legitimate business reason for its termination of plaintiff.  Defendant contends it is entitled to summary judgment on Count 2 because it did not interfere with plaintiff's rights under the FMLA.  As to Count 6, defendant argues that plaintiff's negligent infliction of emotional distress claim fails as a matter of law because plaintiff cannot establish a genuine issue of material fact that Klaff's acted unreasonably in the termination process.

For the reasons that follow, defendant's motion will be granted as to Counts 5 and 6, and denied as to Counts 1 and 2.

## I.   Factual Background[2]

---

[1] As defendant notes, plaintiff appears to have misnumbered his Amended Complaint, as it includes Counts 1 through 3 and 5 through 6, but no Count 4.  Thus, the only counts remaining, after dismissal of Counts 3 and 5, are Counts 1, 2, and 6.

[2] Plaintiff moves to strike the affidavits attached to defendant's motion on grounds that they were not disclosed during discovery and their varies from the witnesses' prior deposition testimony.  See Mot. to Strike [Doc. # 38].  Preliminarily, and as defendant notes, affidavits appearing to have been created for summary judgment purposes are not required to be disclosed during discovery (as they likely did not exist then) and, additionally, plaintiff had the opportunity to depose these affiants.  See Palma v. Pharmedica Communications, Inc., 00CV1128 (AHN), 2002 WL 32093275, at *2 (D. Conn. Mar. 27, 2002).  Further, as this Court

Mr. Dupee began his employment at Klaff's as a security
officer in 1995.  The duties of Klaff's security guards include
"mak[ing] sure all vital locations of the store are covered
during the day.  This includes the Hardware door area, which must
be manned at all times;" "open[ing] doors for customers and
be[ing] available to assist customers with packages when
necessary;" "walk[ing] through the store checking for
shoplifters;" "mak[ing] sure that all merchandise taken by
employees is properly signed out;" "accompany[ing] employees and
customers to the parking lot when requested to ensure safety;"
"driv[ing] the van and pick[ing] up and drop[ping] off both
employees and customers according to the schedule;" "mak[ing]
sure that the parking lot is for authorized parking only;" and
"ensur[ing] that the . . . Security Check List is followed when

---

held in Ricci v. Destefano, 04cv1109 JBA, 2006 WL 2666081, at *1
(D. Conn. Sept. 15, 2006), it is inappropriate to strike material
contained in exhibits to motions, including declarations and
affidavits.  As both parties appear to recognize, "a party may
not create an issue of fact by submitting an affidavit in
opposition to a summary judgment motion that . . . contradicts
the affiant's previous deposition testimony," Bickerstaff v.
Vassar College, 196 F.3d 435, 455 (2d Cir. 1999), and, further,
Fed. R. Civ. P. 56(e) requires that an affidavit submitted in
opposition to a motion for summary judgment "shall be made on
personal knowledge, shall set forth such facts as would be
admissible in evidence, and shall show affirmatively that the
affiant is competent to testify to the matters stated therein"
and evidence that would be inadmissible at trial may not be used
to meet plaintiff's burden under Rule 56.  See Burlington Coat
Factory Warehouse Corp. v. Esprit de Corp, 769 F.2d 919, 924 (2d
Cir. 1985).  The Court bears these principles in mind in its
analysis of the summary judgment record.  Plaintiff's Motion to
Strike will thus be denied.

closing the store in the evening." Security Guard Duties [Doc. # 28, Ex. B].

The "Rules and Regulations for Security Dept.," which plaintiff signed, see [Doc. # 28, Ex. D], state, inter alia: "If you are going to be late for work or not come in to work, you must call in ½ hour before starting time and leave a message with personnel dept. Failure to do so will result in disciplinary action or termination. . . . No guard is to leave the premises unless he gets prior authorization from management, such as the personnel dept. . . . Leaving the premises for personal business or errands will not be allowed, unless approved by management, such as the personnel dept. and the time clock must be punched when doing so." Plaintiff also signed a "Receipt of Klaff's Employee Handbook," [Doc. # 28, Ex. E], which Handbook provides the procedures for vacation and sick leave benefits, employee conduct, and attendance and punctuality rules. The Handbook states "SICK LEAVE BENEFITS . . . In the event of an illness or other absence, it is expected that the employee will notify their manager in accordance with company policy. Please refer to the ATTENDANCE policy in this handbook for more information;" "EMPLOYEE CONDUCT AND WORK RULES The following are examples of infractions of rules of conduct that may result in disciplinary action, up to and including termination of employment . . . excessive absenteeism or any other absence without notice . . .

unauthorized absence from work during the workday;" and

"ATTENDANCE AND PUNCTUALITY . . . If you are unable to arrive at

work on time or at all you must notify your supervisor directly.

Such notification should occur verbally at least 30 minutes prior

to the store opening time (or your given shift's start time)."

Employee Handbook [Doc. # 28, Ex. F] at ¶¶ 4.4, 6.1, 6.4.

On January 22, 2003, while making a bank deposit for

Klaff's, plaintiff was involved in a motor vehicle accident.  On

January 24, 2003, plaintiff filed a workers' compensation claim

for the accident and he was out from January 23, 2003 to February

25, 2003 due to his injuries.  Plaintiff received workers

compensation payments while he was out of work.  Dupee Dep. [Doc.

# 28, Ex. B] at 120-21, 125.  Upon his return to work, plaintiff

was put on desk duty because he could not drive.  Petito Dep.

[Doc. # 39, Ex. 8] at 42.  The parties agree that after

plaintiff's return to work in February 2003, plaintiff

periodically had to leave work to attend medical appointments.

Defendant contends that it did not have a problem with this, but

that it needed plaintiff to provide notice as to when he was

going, so that his shift could be covered, and that plaintiff did

not always do this and he also would not punch out when he left

for his appointments.  Petito Aff. [Doc. # 28, Ex. H] ¶ 7; Petito

Dep. at 43-44.  Defendant also claims that in the couple of years

before plaintiff's accident and also following the accident,

plaintiff's work performance was "deteriorating," he was not
paying attention to his job, he did not want to drive the van in
bad weather or sometimes at all, and he would not punch out or
give notice when he had to leave for appointments or personal
errands.  Caceres Aff. [Doc. # 28, Ex. G] ¶ 8; Caceres Dep. [Doc.
# 39, Ex. 9] at 30-31; Petito Aff. ¶¶ 4-5; Petito Dep. at 29-30;
Heath Dep. [Doc. # 39, Ex. 10] at 63-72.  Plaintiff contends,
however, that he always contacted his supervisors when he was
going to be out and provided doctor's notes for sickness and
medical appointments, Dupee Dep. at 61-62, 64, 112, and points to
his annual performance appraisals from 1998 through 2003, which
gave him either "very good" or "above average" overall ratings.
See [Doc. # 39, Ex. 4].

Plaintiff also describes various comments made to him while
he was out of work after his accident and when he needed to be
absent for doctors appointments.  He testifies that while he was
out after his accident, Mollie Passero (co-owner of Klaff's)
called him and "was very upset about the accident" and told him
to "come in to work.  Nothing is wrong with you.  Come back to
work.  Nothing is wrong with you.  You didn't get hurt, really
injured," and she was "quite upset."  Id. at 103-04.  Plaintiff
also states that Klaff's general manager, Jeffrey Heath, would
swear, yell, and ridicule him in front of customers when he
returned from doctor's appointments, for example saying

6

"[t]here's not a doctor that could see you on Saturday," and that plaintiff was "full of shit."  <u>Id</u>. at 107-11.  Plaintiff testifies that he "didn't feel it was right to be yelled and screamed at by Jeff Heath, also with the language, to be embarrassed in front of people," and ultimately plaintiff complained to Mollie Passero, who said she would talk to Health, and to Mollie's daughter, Lisa.  <u>Id</u>. at 111.

Ultimately, on February 27, 2004, plaintiff was terminated. Disputing plaintiff's claims of illegal conduct, defendant contends that plaintiff was terminated due to his poor work performance, frequent absences without prior notification and/or doctors notes, and, particularly, his un-noticed absences on January 28, 2004, February 11, 2004, and February 21, 2004. Plaintiff does not specifically remember the circumstances of these days, and remembers being on vacation from February 20-27. He reiterates that he always called and provided doctors notes when he was absent.  In any event, defendant's Human Resources manager, Juan Caceres, states that once the decision was made to terminate plaintiff, he attempted to contact plaintiff by phone, but was unsuccessful.  Caceres Aff. ¶ 10.  He testifies that the following week plaintiff was absent from work on Wednesday and Thursday, his "regularly scheduled workdays," and that plaintiff had not requested vacation that week.  <u>Id</u>.  Caceres finally reached him and set up a meeting in his office between 10 a.m.

and 11 a.m. on that Saturday, February 27, 2006.  Caceres
arranged for supervisors Petito and Heath to be present, but when
plaintiff did not arrive by 11:15 a.m., Petito and Heath had to
leave for other meetings.  <u>Id</u>.  When plaintiff arrived at 11:30
a.m., Caceres told him that he was being terminated.  Caceres
testifies that the meeting was held in private with no other
employees present, that he treated plaintiff "respectfully and
conducted the meeting in a professional manner," and that he "had
no way of knowing, and certainly did not believe, that Mr. Dupee
would suffer any emotional distress from the termination
process."  <u>Id</u>.

        Plaintiff, by contrast, testifies that he was not aware of
anyone having trouble reaching him, and that when he called
Caceres on February 27 to say he would be coming into work (after
his vacation), he was told to come to Caceres office and that
there would be a change of some kind.  Dupee Dep. at 54-55, 57.
Plaintiff testifies that after Caceres told him he was
terminated, he asked "What are the reasons?  Can you tell me?"
and Caceres told him "Well, you have had too many doctors
appointments."  <u>Id</u>. at 99.  Plaintiff does not dispute that the
meeting took place in private and that Caceres was professional
and respectful, but contends that he didn't do anything to
warrant termination "in this manner," and that he received no
warning.  <u>Id</u>. 133-34.

## II.   Standard

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A party seeking summary judgment "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law."  Rodriguez v. City of N.Y., 72 F.3d 1051, 1060 (2d Cir. 1995) (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970)).  "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion."  Id. (citations omitted).  "If reasonable minds could differ as to the import of the evidence . . . and if there is any evidence in the record from any source from which a reasonable inference in the nonmoving party's favor may be drawn, the moving party simply cannot obtain a summary judgment."  R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 59 (2d Cir. 1997) (internal quotation, citation, and alteration omitted).  However, "[w]here

9

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (internal quotation and citation omitted).

In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden of establishing that there is no genuine issue of material fact in dispute will be satisfied if he or she can point to an absence of evidence to support an essential element of the non-moving party's claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). "A defendant need not prove a negative when it moves for summary judgment on an issue that the plaintiff must prove at trial. It need only point to an absence of proof on plaintiff's part, and, at that point, plaintiff must 'designate specific facts showing that there is a genuine issue for trial.'" Parker v. Sony Pictures Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex, 477 U.S. at 324); see also Gallo v. Prudential Residential Servs. Ltd. P'ship, 22 F.3d 1219, 1223-24 (2d Cir. 1994) ("[T]he moving party may obtain summary judgment by showing that little or no evidence may be found in support of the nonmoving party's case."). The non-moving party, in order to defeat summary judgment, must then come forward with evidence that would be sufficient to support a jury verdict in his or her

10

favor.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)
("[T]here is no issue for trial unless there is sufficient
evidence favoring the nonmoving party for a jury to return a
verdict for that party.").  In making this determination, the
Court draws all reasonable inferences in the light most favorable
to the party opposing the motion.  <u>Matsushita</u>, 475 U.S. at 587.
However, a party opposing summary judgment "may not rest upon the
mere allegations or denials of the adverse party's pleading,"
Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the
material facts" is insufficient.  <u>Matsushita</u>, 475 U.S. at 586
(citations omitted).

**III. Discussion**

    **A.   Retaliatory Discharge (Count 1)**

    Count 1 of plaintiff's Amended Complaint seeks redress for
claimed retaliatory discharge in violation of Conn. Gen. Stat. §
31-290a for plaintiff's filing a workers compensation claim.
Section 31-290a(a) provides:

> No employer who is subject to the provisions of this
> chapter shall discharge, or cause to be discharged, or
> in any manner discriminate against any employee because
> the employee has filed a claim for workers'
> compensation benefits or otherwise exercised the rights
> afforded to him pursuant to the provisions of this
> chapter.

    Defendant argues that it is entitled to summary judgment on
Count 1 because plaintiff cannot prove a causal link between his
filing of a workers compensation claim and his termination.

Moreover, defendant claims that even if plaintiff could demonstrate a prima facie case of retaliation, it is nevertheless entitled to summary judgment because it has presented a legitimate business reason for plaintiff's termination, i.e., un-noticed absences and deteriorating work performance.

"Connecticut courts often turn to federal law for guidance in setting forth the appropriate burdens of proof in various discrimination/retaliation challenges." Lane v. Compass Group USA, Inc., 05cv579 (EBB), 2005 WL 2710165, at *3 (D. Conn. Oct. 21, 2005) (citing cases).  Thus, turning to the Supreme Court's articulation of the burdens and order of presentation proof in cases involving claims of employment discrimination in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), the plaintiff bears the initial burden of proving by a preponderance of the evidence a prima facie case of discrimination.  Id. at 802.  In order to meet this burden, he must present evidence supporting an inference of unlawful discrimination.  See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 252-53 (1981).  If the plaintiff satisfies his prima facie case, the burden then shifts to defendant to rebut the presumption of discrimination by producing evidence of a legitimate, nondiscriminatory reason for the adverse employment action taken.  McDonnell Douglas, 411 U.S. at 802.  "If the defendant carries this burden of production, the presumption raised by the prima facie case is rebutted, and the

12

factual inquiry proceeds to a new level of specificity."
Burdine, 450 U.S. at 255.  The burden then shifts back to the
plaintiff to prove that he was discriminated against "either
directly by persuading [the jury] that a discriminatory reason
more likely motivated the employer or indirectly by showing that
the employer's proffered explanation is unworthy of credence."
Id. at 256.

"To make out a prima facie case of retaliation, an employee
must show that the employee was engaged in protected activity;
that the employer was aware of that activity; that the employee
suffered adverse employment decisions; and that there was a
causal connection between the protected activity and the adverse
employment action."  Collins v. New York City Transit Auth., 305
F.3d 113, 118 (2d Cir. 2002).

Prima Facie Case

Turning first to plaintiff's prima facie case, defendant
disputes only the "causal connection" element, by contending that
the date of plaintiff's filing of his workers compensation claim
is too attenuated from his termination to support an inference of
retaliation, and that no other evidence of retaliatory motivation
exists.

Plaintiff filed his workers compensation claim on January
24, 2003 and was terminated effective February 27, 2004.  While
this 13-month gap is substantial, it is not too temporally

13

disconnected to support an inference of retaliation.  See, e.g.,
Grant v. Bethlehem Steel Corp., 622 F.2d 43, 45-46 (2d Cir. 1980)
(eight-month gap between filing of EEOC complaint and retaliatory
action suggested a causal relationship); Suggs v. Port Authority
of N.Y. & N.J., 97civ4026 (RPP), 1999 WL 269905, at *6 (S.D.N.Y.
May 4, 1999) (termination six months after plaintiff filed an
EEOC charge was "sufficiently close in time to raise an inference
of retaliation"); Bernhardt v. Interbank of N.Y., 18 F. Supp. 2d
218, 226 (E.D.N.Y. 1998) (eleven months between protected
activity and termination might suggest causal link where
defendant had reasons for delaying termination).  This is
particularly true in this case where there is other evidence of
retaliation, such as evidence that defendant's workers
compensation insurance rates (called "experience rating") went up
19% as a result of plaintiff's claim,[3] see Petito Dep. at 12-13,
which effect would have been felt over the year between
plaintiff's filing his claim and his termination thus providing
potential retaliatory motivation during that time, and the direct
evidence of retaliatory animus in the form of Mollie Passero's
anger and demands that plaintiff return to work and insistence

---

[3] Plaintiff's other evidence that Klaff's management was
upset that its insurance rates went up due to plaintiff's claim,
in the form of hearsay evidence from another employee who
reported to plaintiff having heard one of Klaff's owners
complaining about it, see Dupee Dep. at 101-03, cannot support
plaintiff's case as it is inadmissible hearsay.  See note 2,
supra.

14

that nothing was wrong with him.[4]  Moreover, although plaintiff's termination did not occur until 13 months after the filing of his claim, he testifies to other adverse conduct taken against him, including ridicule and harassment by Heath whenever plaintiff needed to be absent for a doctor's appointment, which occurred closer in time to the filing of his claim.  Cf. generally Burlington Northern & Sante Fe Railway Co. v. White, 126 S. Ct. 2405, 2415 (2006) (in order to show an adverse employment action in the retaliation context, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination").  Thus, plaintiff has adduced sufficient evidence to support a causal connection between his filing of a workers compensation claim and his termination.

Pretext

Defendant has met its burden of producing a legitimate nondiscriminatory reason for plaintiff's termination, citing plaintiff's un-noticed absences, particularly on January 29, February 19, and February 21, 2004, and plaintiff's deteriorating work performance.  However, plaintiff has succeeded in adducing

---

[4] While Ms. Passero denies making these statements to plaintiff, see Passero Aff. ¶ 7 [Doc. # 45, Ex. E], such denials do not, as defendant claims, warrant summary judgment, but rather create a genuine dispute of material fact for trial.

15

evidence sufficient to support an inference that these reasons are pretextual and that the real reason for plaintiff's termination was retaliatory.

As to defendant's claim of deteriorating work performance, plaintiff's performance appraisals belie defendant's contention, as his overall ratings from 1998 through 2003 were consistently either "very good" or "above average."  See [Doc. # 39, Ex. 4]. Moreover, plaintiff testified that he received no warning of poor performance.  As to the claimed un-noticed absences, defendant's representatives all testified that they had no problem with plaintiff leaving for doctor's appointments, but just that he had to provide advance notice, see Caceres Aff. ¶ 6; Petito Aff. ¶ 7; Petito Dep. at 43-44, and plaintiff testified that he always contacted his supervisors when he was going to be out (for a doctor's appointment or for sick leave) and provided doctor's notes, see Dupee Dep. at 61-62, 64, 112.  Thus, the issues of whether plaintiff had un-noticed absences and whether defendant terminated him for this reason also remain in dispute to be resolved at trial.  Accordingly, defendant's motion for summary judgment on Count 1 will be denied.

**B.   FMLA (Count 2)**

Count 2 claims defendant violated the FMLA by terminating plaintiff for exercising his right to take FMLA leave on an intermittent basis and by failing to inform him of his FMLA leave

entitlement after his accident.

The FMLA provides that "an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following: . . . Because of a serious heath condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1).  The Act further provides that for such a condition "leave . . . may be taken intermittently or on a reduced leave schedule when medically necessary."  Id. § 2612(b)(1); accord 29 C.F.R. § 825.203.  Regulations promulgated under the Act define "intermittent leave" as "FMLA leave taken in separate blocks of time due to a single qualifying reason. . . . There is no limit on the size of an increment of leave when an employee takes intermittent leave or leave on a reduced leave schedule."  29 C.F.R. § 825.203(a), (d).  The Act provides that "[i]t shall be unlawful for any employer to interfere with, retrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter."  29 U.S.C. § 2615(a)(1); accord 29 C.F.R. § 825.220(a).  A claim that an employee was "punished" or retaliated against for exercising his or her rights under the FMLA is cognizable as interference with his or her FMLA rights. Potenza v. City of N.Y., 365 F.3d 165, 167 (2d Cir. 2004).

Because the intent of an employer is material in FMLA interference claims, "the retaliation analysis pursuant to

17

McDonnell Douglas is applicable." Id. at 168; Walker v. The
Access Agency, 02cv199 (AHN), 2004 WL 2216526, at *8 (D. Conn.
Aug. 31, 2004).  To make out a prima facie case, a plaintiff
"must establish that: (1) he exercised rights protected under the
FMLA; (2) he was qualified for his position; (3) he suffered an
adverse employment action; and (4) the adverse employment action
occurred under circumstances giving rise to an inference of
retaliatory intent."  Protenza, 365 F.3d at 168.  As described
above with respect to Count 1, once the plaintiff has made out a
prima facie case, the burden shifts to defendant to articulate a
legitimate nondiscriminatory reason for its action.  If the
defendant provides such a reason, the burden shifts back to the
plaintiff to provide evidence from which a jury could conclude
that the defendant's proffered reason for its action is
pretextual and that the real reason for its action was
retaliation for plaintiff's exercise of rights protected under
the FMLA.  See McDonnell Douglas, 411 U.S. at 802-03.

        1.   Lack of Notice

     Plaintiff's claim of a FMLA violation arising from
defendant's alleged failure to provide him notice of his FMLA
entitlement is insufficient to survive summary judgment.  The
Second Circuit has held that "to the extent that [a plaintiff]
contends that the assumed right to notice stands as an
independent right under the Act, and that an employee may sue the

                              18

employer for failure to give notice even if that failure in no
way affected the employee's leave, benefits, or reinstatement, we
reject that contention.  The Act makes it unlawful for the
employer to impede an employee's actual or attempted 'exercise'
of a right provided under subchapter I.  A right to receive
notice is not a right that the intended recipient of notice
'exercises.'" <u>Sarno v. Douglas Elliman-Gibbons & Ives, Inc.</u>, 183
F.3d 155, 162 (2d Cir. 1999).

        The record shows that plaintiff took FMLA leave – both full-
time leave immediately following his accident and intermittent
leave in the form of medical appointments in the year following
his return from full-time leave.  Plaintiff does not adduce any
evidence that lack of notice of his FMLA rights interfered with
or prevented him from taking leave.  Further, plaintiff does not
respond to defendant's argument concerning plaintiff's lack of
notice claim nor elaborate on the theory of this claim in his
opposition memorandum.  Accordingly, summary judgment as to this
theory of plaintiff's FMLA claim will be granted.

        2.   <u>Termination</u>

        <u>Prima Facie Case</u>

        Defendant disputes only the "inference of retaliatory
intent" element of plaintiff's <u>prima</u> <u>facie</u> case.  In doing so,
defendant observes that plaintiff was not out on FMLA leave when
he was terminated and, in any event, there is no evidence

supporting an inference of retaliatory conduct.

However, contrary to defendant's contentions, such evidence does appear in the summary judgment record.  The record shows that at the point when plaintiff was fired in February 2004, he had taken approximately a month of leave immediately following his accident in early 2003, and had taken "intermittent" leave in the form of absences for medical appointments between his return in February 2003 and his termination in February 2004.  While defendant claims that plaintiff did not give adequate notice of all of his intermittent leave, plaintiff disputes this. Additionally, there is evidence that plaintiff was harassed and ridiculed upon returning from his medical appointments, suggesting retaliatory animus.  Further, direct evidence of retaliatory action exists in the form of the explanation plaintiff claims Caceres gave when terminating him, that he was being fired because he "had too many doctors appointments." Dupee Dep. at 99.  Termination of an employee for exercise of his FMLA rights unequivocally constitutes a violation of the FMLA. 29 U.S.C. § 2615(a)(1).

        Pretext

Plaintiff having adduced evidence sufficient to satisfy his prima facie case, the burden shifts to defendant to articulate a legitimate nondiscriminatory reason for plaintiff's termination, which burden defendant meets as described above by claiming that

20

plaintiff was terminated for un-noticed absences and poor performance.  However, as examined above with respect to Count 1, plaintiff has adduced sufficient evidence of pretext to support an inference of retaliatory conduct by reference to his 1998-2003 positive performance evaluations and by his testimony that he always provided notice and doctors notes when he was going to be absent.  Plaintiff also claims that he was out on a noticed, approved vacation on the day Klaff's allegedly decided to terminate him for excessive un-excused absences.  Additionally, as noted above, there is direct evidence of retaliatory animus for plaintiff having exercised his FMLA rights, as according to plaintiff Caceres told him he was being terminated for "too many doctors appointments."[5]  Thus, defendant's motion as to Count 2 must also be denied.

**C.   Negligent Infliction of Emotional Distress (Count 6)**

Count 6 claims negligent infliction of emotional distress for unreasonable conduct in the termination process "[b]y permitting the plaintiff to take time off for doctor's appointments after his car accident, and then using that time off

---

[5] Plaintiff's contention that he is entitled to an adverse inference instruction at trial due to defendant's alleged loss or destruction of the doctors notes he provided (see Pl. Mot. for Instruction [Doc. # 37]) will be the subject of a separate ruling and the Court need not consider plaintiff's argument here as even without reflection on the potential effect of such an instruction, there is sufficient evidence for plaintiff to survive summary judgment on his FMLA claim.

as a rationale for terminating his employment." Am. Compl. ¶ 36. Plaintiff testifies that he did not do anything to warrant termination in the manner in which he was terminated and that he received no warning, and recounts his depression following termination. Defendant contends that there is no evidence supporting an inference that it acted unreasonably in the termination process.

"In order to recover on a claim of negligent infliction of emotional distress, the plaintiff must prove that the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that distress, if it were caused, might result in illness or bodily harm." <u>Gomes v. Commercial Union Ins. Co.</u>, 258 Conn. 603, 619 (2001) (internal quotation omitted). Thus, a claim for negligent infliction of emotional distress "focuses on the manner of the discharge, whether the employer's conduct in the termination process was unreasonable, not whether the termination itself was unreasonable." <u>Cameron v. Saint Francis Hospital & Med. Ctr.</u>, 56 F. Supp. 2d 235, 241 (D. Conn. 1999) (internal citation omitted). Courts have expressed concern that the cause of action should "be limited so as not to open up a wide vista of litigation in the field of bad manners, where relatively minor annoyances had better be dealt with by instruments of social control other than the law." <u>Montinieri v. S. New England Tel. Co.</u>, 175 Conn. 337,

22

345 (1978) (internal quotation omitted).  Thus, in the employment context, a tort of negligent infliction of emotional distress arises only where it is based on the unreasonable conduct of the defendant during the termination process.  See Parsons v. United Techs. Corp., 243 Conn. 66, 88 (1997).  "The mere termination of employment, even where it is wrongful, is therefore not, by itself, enough to sustain a claim for negligent infliction of emotional distress."  Id. at 88-89.

Here, plaintiff's evidence does not support an inference that defendant's conduct was unreasonable.  Plaintiff cannot dispute defendant's contention that it tried to contact him as soon as the termination decision had been made (he testifies only that he is unaware of anyone ever having any trouble reaching him), and does not dispute Caceres's testimony that he treated plaintiff in a respectful and professional manner during their conversation.  Plaintiff's claim that there was no justification for his termination "in this manner" and that defendant allowed him to take time off for medical appointments and then used those absences as a purported rationale for discharging him are challenges to the reasonableness and fairness of the termination decision itself, not the manner in which it was executed, which is insufficient to support a negligent infliction claim.  See Cameron, supra (negligent infliction claims "focus[] on the manner of the discharge, whether the employer's conduct in the

23

termination process was unreasonable, not whether the termination itself was unreasonable").

Thus, defendant's motion as to Count 6 will be granted.

**IV.  Conclusion**

For the foregoing reasons, defendant's Motion for Summary Judgment [Doc. # 28] is GRANTED in part, as to plaintiff's Workers Compensation claim (Count 5) and Negligent Infliction of Emotional Distress claim (Count 6), and DENIED in part as to plaintiff's Retaliatory Discharge (Count 1) and FMLA (Count 2) claims.  Plaintiff's Motion to Strike [Doc. # 38] is DENIED.

IT IS SO ORDERED.

                    /s/
            _____
            Janet Bond Arterton
            United States District Judge

**Dated at New Haven, Connecticut this 8th day of November, 2006.**